POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM DOBAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LOANDEPOT, INC., ANTHONY HSIEH, PATRICK FLANAGAN, NICOLE CARRILLO, ANDREW C. DODSON, JOHN C. DORMAN, BRIAN P. GOLSON, and DAWN LEPORE,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Adam Doban ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly-available information.  Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below).   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons and entities who purchased or acquired shares of loanDepot, Inc. ("loanDepot" or the "Company") pursuant or traceable to the Company's Registration Statement and Prospectus (together, the "Offering Documents") issued in connection with the Company's February 16, 2021 initial public offering (the "IPO" or the "Offering"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.     Plaintiff alleges that the Registration Statement and Prospectus incorporated therein (collectively, the "Registration Statement") issued in connection with the IPO

-2-

CLASS ACTION COMPLAINT

contained materially incorrect or misleading statements and/or omitted material information that was required to be disclosed.

3.     In its IPO, loanDepot sold 3,850,000 shares of its Class A common stock to the public at a price of $14.00 per share for total proceeds of approximately $54 million, net of underwriting discounts and commissions.

4.     On February 16, 2021, the Company filed its Prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.

5.     loanDepot's Prospectus issued in connection with the IPO described the Company as follows:

> loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform designed around the consumer that has redefined the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S. We are the second largest retail-focused non-bank mortgage originator and the fifth largest overall retail originator, according to Inside Mortgage Finance.
>
> ***
>
> Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot. We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations.
>
> ***

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8

We are a data driven company. We utilize data from lead acquisition, digital marketing, in-market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain mello DataMart, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance.

9

\*\*\*

10
11
12
13
14

Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions.

15

\*\*\*

16
17
18
19
20
21

Our platform and technology create a significant financial advantage. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability.

22
23
24
25
26
27
28

6.     The Registration Statement was negligently prepared and omitted to disclose material adverse facts.  Specifically, Defendants failed to disclose to investors: (1) that the Company's refinance originations had already declined substantially at the time of the IPO due to industry over-capacity and increased competition; (2) that the Company's gain-on-sale margins had already declined substantially at the time of the

CLASS ACTION COMPLAINT

IPO; (3) that, as a result, the Company's revenue and growth would be negatively impacted; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.     By August 17, 2021, loanDepot's stock fell to $8.07 per share, a more than 42% decline from the IPO price, having plummeted in response to information reflecting the materialization of significant risks misrepresented and omitted from the Registration Statement as alleged herein.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

10.     Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b).   loanDepot is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

CLASS ACTION COMPLAINT

not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### A.   Plaintiff

12.   Plaintiff, as set forth in the attached Certification, acquired loanDepot common stock at artificially inflated prices pursuant and/or traceable to the Offering Documents for the Company's IPO and was damaged thereby.

### B.   loanDepot and the Individual Defendants

13.   Defendant loanDepot is a Delaware corporation with principal executive offices located at 26642 Towne Centre Drive, Foothill Ranch, California.  loanDepot's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LDI."

14.   Defendant Anthony Hsieh ("Hsieh") at all relevant times, was the founder, Chairman and Chief Executive Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

15.   Defendant Patrick Flanagan ("Flanagan") at all relevant times, was the Chief Financial Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

CLASS ACTION COMPLAINT

16.     Defendant Nicole Carrillo ("Carrillo") was, at all relevant times, the Executive Vice President of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.     Defendant Andrew C. Dodson ("Dodson") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021, authorizing his name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

18.     Defendant John C. Dorman ("Dorman") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021, authorizing his name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

19.     Defendant Brian P. Golson ("Golson") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021, authorizing his name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

20.     Defendant Dawn Lepore ("Lepore") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021, authorizing her name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

CLASS ACTION COMPLAINT

21.     The Defendants named above in ¶¶14-20 are collectively referred to herein as the "Individual Defendants."

22.     loanDepot and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

23.     loanDepot is an independent retail mortgage lender that provides residential loans, refinance loans, and personal loan products nationwide.   The Prospectus for the Company's IPO described the Company's business as follows:

> loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform designed around the consumer that has redefined the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S.
>
> ***
>
> Consumer-facing industries continue to be disrupted by technological innovation. The mortgage industry is no different with consumers expecting increased levels of convenience and speed. ***The residential mortgage market in the U.S. is massive—with approximately $11.0 trillion of mortgages outstanding as of September 30, 2020—and is largely served by legacy mortgage originators, which require consumers to navigate time-consuming and paper-based processes to apply for and obtain mortgage loans. mello®, our proprietary end-to-end technology platform, combined with our differentiated data analytics capabilities and nationally recognized***

***consumer brand*, *uniquely positions us to capitalize on the ongoing shift towards at-scale*, *digitally-enabled platforms*.**

***Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot*.** We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations.

\*\*\*

We are a data driven company. We utilize data from lead acquisition, digital marketing, in-market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain *mello DataMart*, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance.

We leverage our brand, technology and data to serve customers across our two interconnected strategies: Retail and Partner. Our Retail strategy focuses on directly reaching consumers through a combination of digital marketing and more than 2,000 digitally-empowered licensed mortgage professionals. In our Partner strategy, we have established deep relationships with mortgage brokers, realtors, joint ventures with home builders, and other referral partners. These partnerships are valuable origination sources with lower customer acquisition costs. Our technology is a key component of the value proposition to these partner relationships, allowing us to integrate directly into our partners' native systems. We maintain integrated referral relationships with several leading brands, including a partnership with one of the 10 largest U.S. retail banks by total assets. During 2019, our Retail strategy produced 72% of our origination volume, with our Partner strategy representing the remaining 28%.

CLASS ACTION COMPLAINT

Our digital-first approach across our Retail and Partner strategies leverages the power of *mello®* to create a streamlined experience for consumers. Our predictive models route leads to the right loan officer at the right time to optimize the consumer's experience and best serve their needs. Based on each consumer's needs and preferences, leads are directed to in-house or in-market loan officers, team members at our centralized operations locations, or our digital self-service platform. Our in-market loan officers are able to leverage their long-term relationships as well as our proprietary *mello®* platform and loanDepot brand, driving improved profitability per loan officer.

Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. ***Our recapture rates are among the highest in the industry — for the nine months ended September 30, 2020, our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18% for the three months ended September 30, 2020*** according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. ***Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins***.

***We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share***. Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. We have a well-defined plan to accelerate

CLASS ACTION COMPLAINT

this growth by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

*Our platform and technology create a significant financial advantage*. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. *For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry*.

(Emphasis added.)

24. Prior to the IPO, the Company was majority owned by founder and CEO Defendant Hsieh (61%) and 38% by Parthenon Capital ("Parthenon"), as reflected in the following chart:

CLASS ACTION COMPLAINT

| Name of Beneficial Owner | Class A Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (2) | | | | | | Class D Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (3) | | | | | | Combined Voting Power (4) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | After This Offering | After This Offering & Option Exercise |
| | # | % | # | % | # | % | # | % | # | % | # | % | % | % | % |
| Entities affiliated with Parthenon Capital (5) | 124,810,608 | 38.4% | 123,309,280 | 37.9% | 123,084,080 | 37.9% | 121,368,600 | 37.6% | 119,912,600 | 37.1% | 119,694,200 | 37.1% | 38.6% | 38.5% | 38.5% |
| *Executive Officers and Directors:* | | | | | | | | | | | | | | | |
| Anthony Hsieh (6) | 130,837,895 | 40.3% | 129,128,832 | 39.7% | 128,872,472 | 39.7% | — | — | — | — | — | — | 61.3% | 61.1% | 61.1% |
| Patrick Flanagan (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Jeff Walsh (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Jeffrey DerGurahian (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Brian Golson (8) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Andrew Dodson (8) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| John Dorman (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Dawn Lepore (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Nicole Carrillo (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Executive Officers and Directors as a group (9 person) | 130,837,895 | 40.3% | 129,128,832 | 39.7% | 128,872,472 | 39.7% | — | — | — | — | — | — | 61.3% | 61.1% | 61.1% |

25. The Company's IPO was a means for the Company's controlling shareholder, Defendant Hsieh, and the Company's early partner and investor, Parthenon, to cash out their illiquid stock in the Company. Of the IPO proceeds, the Company's insiders (principally Defendant Hsieh and Parthenon) sold 1,456,000 shares of Class A Common Stock compared to 2,394,000 shares sold by the Company. Thus, the Company's insiders received approximately 38% of all proceeds from the IPO.

26. In addition, shortly before the IPO, the Company's insiders caused the Company to make large cash payments to them. In November 2020, the Company paid

profit distributions of $278.8 million to certain of its unitholders, namely Defendant Hsieh and Parthenon.  In December 2020, the Company distributed $71.1 million to the unitholders.  In addition, shortly prior to the IPO, the Company's related entity LD Holdings distributed an additional $159 million to the unitholders.  Moreover, on April 30, 2021, the Company distributed an additional $146.2 million to the unitholders.  Thus, shortly before and/or after the IPO, ***the Company's insiders siphoned off over $655 million in cash from the Company***.

27.     On November 12, 2020, the Company filed a draft Registration Statement on Form DRS with the SEC.  On January 11, 2021, the Company filed a draft Registration Statement on Form S-1 with the SEC.  Following several amendments made in response to comments received by the SEC, the SEC declared the Registration Statement effective on February 10, 2021.  On February 16, 2021, loanDepot filed the Prospectus with the SEC.  The Registration Statement and Prospectus were utilized in the Offering.

28.     Each of the Individual Defendants signed the Registration Statement or signed consent forms dated January 11, 2021, authorizing their names to be included in the Registration Statement as director nominees of loanDepot.

29.     On February 16, 2021, the Company filed its Prospectus with the SEC on Form 424B4.

30.    loanDepot thereafter announced the pricing of its initial public offering of 3,850,000 Class A shares at a price of $14 per share.  The Company announced that its shares had been approved for listing on the NYSE under the symbol "LDI."

31.    The Offering Documents used to effectuate the Company's IPO were negligently prepared, and contained false and misleading statements and material omissions.

32.    The Registration Statement stated that the Company's "innovative technology" had allowed it realize significantly increased revenues and profitability:

> We have demonstrated our ability to grow our business and market share, having grown from a de novo start-up in 2010 to the second largest non-bank retail originator in the U.S. with a 2.6% share of a $11.0 trillion mortgage market as of September 30, 2020. We believe that we are well positioned to continue our market share growth through both our Retail strategy, where we have invested in our team members and technology to enable rapid scaling, and our Partner strategy, where independent brokers, in addition to joint venture and integrated referral partners, increasingly choose to work with us based on our reputation for excellent customer service and seamless user experiences. ***Our growth has accelerated in recent quarters as our long-term investments in brand marketing and innovative technology have helped us achieve industry-leading growth and profitability***.
>
> We believe that ***continuing to make these investments will allow us to grow market share***, ***increase customer retention and deliver enhanced returns that will ultimately enable a virtuous cycle of further investment and returns***.

(Emphasis added.)

CLASS ACTION COMPLAINT

33.   The Offering Documents contained the following chart representing to investors that loanDepot had experienced rapidly increasing loan origination growth:



34.   The Offering Documents also stated:

> We've created a company that is built to serve customers throughout the entire loan transaction, from the onset of the purchase or refinance decision through loan closing and servicing. **We now possess roughly 3% market share of annual mortgage origination volumes**, which makes up part of the $11T total addressable market. Thanks to our brand investment over time, we are also one of the most recognized brands in the industry today. **All of this gives us enormous runway**.

(Emphasis added.)

35.   The Prospectus also stated:

> **We** originated $79.4 billion of loans for the twelve months ended September 30, 2020 and **experienced 116% year-over-**

> *year origination volume growth for the nine months ended September 30, 2020.*

(Emphasis added.)

36.    In another section of the Offering Documents discussing potential competition, the Company represented that its brand and technology protected it against potential competition and that there were significant barriers to entry:

> We believe that we are one of only two non-banks with a nationally-recognized consumer brand in the U.S. retail mortgage origination industry. Since the Company's launch in 2010, we have invested over $1.2 billion in marketing and the promotion of our brand, and we believe there are to ours.

37.    The Offering Documents also trumpeted loanDepot's success in achieving higher-than-average recapture rates and profit margins in its industry, and stated that loanDepot was well-positioned to protect its high profit margins:

> ***Our recapture rates are among the highest in the industry***—for the nine months ended September 30, 2020, ***our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18%*** for the three months ended September 30, 2020 according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.

(Emphasis added.)

38.    The Prospectus also stated that loanDepot had significantly increased its market share and was well-positioned to protect and grow that market share through its

proprietary "platform and technology" which supposedly gave loan Depot a "significant financial advantage":

> *We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share*. Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. *We have a well-defined plan to accelerate this growth* by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

> *Our platform and technology create a significant financial advantage*. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry.

(Emphasis added.)

39.    The Offering Documents represented the following with respect to the Company's gain-on-sale margins:

> While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. Market demand in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained in future years and could result in decreases in revenue.

40.    This statement was false and misleading because the Company was already experiencing lower gain-on-sale margins.  Instead of disclosing this existing fact, the Offering Documents falsely stated that gain-on-sale margins and revenues could be impacted "in future years."  Including a misleading disclosure that margins and revenues could be impacted in "future years" when in fact the margins and revenues *had already been adversely affected* and would continue to be affected in the very next quarter (not year) was itself a false and misleading statement.

41.    The representations in the Offering Documents were also false and misleading because, at the time of the IPO, loanDepot was already experiencing significantly increased competition, greatly reduced originations, and lower gain-on-sale margins.  Neither loanDepot's supposedly proprietary technology or platform or other touted advantages were proving successful in fighting this competition.    Instead,

Defendants concealed from the Offering Documents the fact that loanDepot was being forced to lower prices/rates in order to combat the significantly increased competition, which was leading and would inexorably lead to lower margins and profits.  In addition, its efforts to protect its market share by reducing prices/rates were not enough to protect its loan originations, which were declining and thus leading to reduced revenues. loanDepot failed to disclose these material facts in the Offering Documents, thus making the statements above misleading.

42.    Indeed, when loanDepot announced disappointing Q2 2021 results on August 3, 2021, Defendant Hsieh admitted that everything about loanDepot's business is "highly predictable" and thus that loanDepot had perfect visibility at the time of the IPO as to where its business was and was going.  On the conference call with analysts to discuss loanDepot's Q2 2021 earnings on August 3, 2021, Defendant Hsieh stated, in relevant part, ". . . this is certainly not our first rodeo. *Everything here is highly predictable. There's been very, very little surprise*."

43.    loanDepot never disclosed this information in the Offering Documents. This omitted information was material because the Company's loan originations, growth rate, and margins were highly material to investors.  Indeed, the entire business of loanDepot is loan originations and loan refinancing and thus the misrepresentations and omissions alleged herein concerned the Company's core (and only) product.

CLASS ACTION COMPLAINT

44.     loanDepot had its lawyers craft boilerplate disclosures that it could use in the future to try to argue that the undisclosed facts were actually disclosed.   The following generic and misleading disclosure in the Offering Documents was included by loanDepot for exactly this purpose:

> Our loan originations, particularly our refinance mortgage loan volume, are dependent on interest rates and are expected to decline *if interest rates increase*. Our loan origination activities are also subject to overall market factors that can impact our ability to grow our loan production volume. For example, *increased competition* from new and existing market participants, slow growth in the level of new home purchase activity or reductions in the overall level of refinancing activity *can impact our ability to continue to grow our loan origination volume, and we may be forced to accept lower margins in order to continue to compete and keep our volume of activity consistent with past or projected levels*.

(Emphasis added.)

45.     This alleged disclosure was itself false and misleading.   Telling investors that potential, theoretical increased competition "could" impact revenues and margins is a far cry from telling investors that the company *was already experiencing* significantly increased competition that had already forced it to accept lower margins in order to stave off such competition.   Moreover, interest rates did not increase from the time of the IPO to the Company's announcement of significantly reduced revenues and margins in Q2 2021 (less than six months after the IPO).   Interest rates stayed flat and even were lowered during this time period.   Thus, the Company's boilerplate alleged disclosures in the Offering Documents actually misled investors rather than warning them about

-20-

known, existing facts, as Defendants had an obligation to do under the federal securities laws.

46.     Rather than disclose the known, existing adverse facts, the Offering Documents repeatedly touted the fact that the Company had been extremely successful (even during Covid) of increasing market share, profit margins, and staving off competition:

> While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. We have highlighted below the key steps we have undertaken since the onset of the pandemic to position our platform for continued success:

> - Maintained higher liquidity levels from an increase in cash from retained earnings.

> - Increased our total loan funding capacity with our current lending partners.

> - Stepped up protocols related to verification of key metrics such as employment and income to ensure the highest quality underwriting standards are maintained.

> - Transitioned our workforce to working remotely as of March 19, 2020.

47.     The Company's Offering Documents represented that the Company was experiencing rapid growth in revenues and margins and that the Company's business, performance, prospects and products were well-positioned to continue such high growth rate and margins, while omitting these known trends and facts that had already had a

-21-

CLASS ACTION COMPLAINT

materially unfavorable impact on the Company's revenues and business at the time of the IPO. *See* Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) (requiring that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material, unfavorable impact on a company's operations).

48.    The Registration Statement contained pages and pages of numerous generalized possible "Risk Factors" that might occur and "[i]n case" they did actually occur, then loanDepot's financial condition and results of operation "***could*** be adversely affected."   Those statements were false or misleading and omitted material information for the reasons stated above in ¶45.

49.    The statements identified above that the Company made in the Offering Documents were materially false and misleading when made because, in addition to what was stated above, they failed to disclose:

a.  that the Company's refinance originations had already declined substantially at the time of the IPO due to industry over-capacity and increased competition;

b.  that the Company's gain-on-sale margins had already declined substantially at the time of the IPO;

c.  that, as a result, the Company's revenue and growth would be negatively impacted;

CLASS ACTION COMPLAINT

d.  that the Company had already been forced to embark on a significant expense reduction plan due to the significantly lower growth and refinance originations that the Company was experiencing;

e.  that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis; and

f.  that the Company's business, prospects and ability to achieve growth had been materially impaired by the time of the IPO as a result of adverse industry, sales and earnings trends.

50.  Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), required defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and that each risk factor "adequately describes the risk."  The failure of the Registration Statement to disclose that the Company was experiencing adverse growth and earnings trends, including significantly increased competition in the market for loan originations, reduced gain-on-sale margins, and lower revenues, violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed

facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated 17 C.F.R. §229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in shares of the Company's common stock speculative or risky.

51. By August 17, 2021, loanDepot's stock had declined 42% from its IPO after it disclosed disappointing Q2 2021 results and provided significantly lower guidance for its business.

52. At the time of the filing of this action, loanDepot's stock continues to trade below the Offering price of $14 per share, damaging investors.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired loanDepot common stock in the IPO or purchased loanDepot common stock thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO and were damaged thereby. Excluded from the Class are Defendants, the officers and managers of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and managers of the Company have or had a controlling interest.

CLASS ACTION COMPLAINT

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Since the IPO, the Company's securities have actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by loanDepot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants as alleged herein;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of loanDepot securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

60.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

61.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

62.    The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

63.    loanDepot is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

64.    As issuer of the shares, loanDepot is strictly liable to Plaintiff and the Class for the misstatements and omissions.

65.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering

CLASS ACTION COMPLAINT

Documents were true and without omissions of any material facts and were not misleading.

66.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

67.    Plaintiff acquired loanDepot shares pursuant and/or traceable to the Offering Documents for the IPO.

68.    Plaintiff and the Class have sustained damages.  The value of loanDepot common stock has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Individual Defendants)

69.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

70.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against the Individual Defendants.

71.    The Individual Defendants, by virtue of their offices, managership, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of loanDepot within the meaning of Section 15 of the Securities Act.

The Individual Defendants had the power and influence and exercised the same to cause loanDepot to engage in the acts described herein.

72.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

73.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: September 14, 2021                    Respectfully submitted,

**POMERANTZ LLP**

By: *<u>s/ Jennifer Pafiti</u>*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

***Attorney for Plaintiff***

CLASS ACTION COMPLAINT